**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Lillie Smith-Zimmerman,

             Plaintiff,            Case No. 04-72170

-vs-                                Honorable John Corbett O'Meara

Jo Anne B. Barnhart               Honorable Steven D. Pepe
Commissioner of Social Security,

             Defendant.
_____/

REPORT AND RECOMMENDATION

Plaintiff Lillie Smith-Zimmerman Williams brought this action under 42 U.S.C. § 405(g) and § 1383(c)(3) to challenge a final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits and Supplemental Security Income benefits under Titles II and XVI of the Social Security Act. Both parties have filed motions for summary judgement which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

For the reasons that follow, IT IS RECOMMENDED that Defendant's motion be DENIED and Plaintiff's motion be GRANTED IN PART and this case remanded for further proceedings consistent with this Report and Recommendation.

I.    BACKGROUND

    A.    Procedural History

Plaintiff applied for benefits on January 22, 2002, alleging disability since October 22, 2001, due to herniated cervical discs (R. 42-44, 48). Her claim was denied initially (R. 31). Plaintiff's case was part of an Agency pilot program testing the elimination of the

reconsideration level, allowing Plaintiff to request a hearing before an Administrative Law

Judge.  *See* 64 Fed. Reg. 47,218, 47,219 (1999); 20 C.F.R. § 404.906. An Administrative hearing

was held on January 9, 2004, before Administrative Law Judge ("ALJ") Alfred Varga.  Plaintiff

testified and was represented by counsel (R. 406-27).  Vocational expert ("VE") Elizabeth

Pasikowski also testified.  In a March 12, 2004, decision, the ALJ found that Plaintiff was not

disabled (R. 13-21).  The Appeals Council denied review on April 22, 2004 (R. 7-9).

      B.    <u>Background Facts</u>

      Plaintiff, born February 1, 1955,  was 49 years old at the time of the ALJ's decision (R.

42, 409).  She graduated from college and had a master's degree in education (R. 54, 409).  She

worked for twenty-two years as a high school teacher (R. 49, 409).  She remains insured for

benefits through December 31, 2006 (R. 45).

      1.    *Plaintiff's Hearing Testimony*

      Plaintiff stopped working because of neck pain that traveled down her left arm and leg

(R. 410).  The state retired her on disability (R. 422).  She had been diagnosed with fibromyalgea

and degenerative disc disease, but she could not tell which was the source of her pain (R. 410-

11).  The pain was most intense across the back of her head, the left side of her face, and across

her left arm, leg and hip (R. 411).  She experienced pain at a severity level of 9 on a 10-point

scale at least four days a week (R. 412).  On other days, she rated her pain at 5 or 6.  She had

been wearing a TENS unit.  Though her primary mode of relief was injections, she also did

stretches, took lots of medication and used a vibrating, heated recliner for pain relief.  Her

medications made her feel very groggy, lose her balance, and caused nausea and vomiting (R.

413).  She could not distinguish which medications caused which side effect.  Regarding her

injections, she received trigger point injections about once every four weeks, sometimes more frequently if necessary. They caused her arm to go numb so that she was not in pain, but also caused her to have less use of the arm. The shots provided relief for seven to ten days. She also received hip injections, also about every four weeks. This provided relief for about a week (R. 415).

Plaintiff also described an intense depression, which she experienced since about April, 2001. She was in pain, felt weak and was unable to perform her job. She initially spoke with her minister and a church group, and eventually saw a doctor after she obtained medical insurance (R. 416). She was hospitalized for psychiatric problems in December 2002 (R. 417). Plaintiff explained that she felt worthless and without purpose. She lost everything she had worked for and saw herself living under freeway overpasses. She did not sleep well. She had been prescribed Ambien, a sleep aid, but could not afford it because there was no generic version available. She continues to attend church, "because it's the only day of the week I can get out of the house" (R. 418).

Plaintiff estimated that she could walk for about twenty minutes before experiencing extreme difficulty. After that, he leg became numb and painful, and she fell or stumbled. The numbness caused her to not be able to tell where she was placing her foot. She could stand for about ten to fifteen minutes, and then her leg became numb and pain shot down her leg, radiated up her back, and she felt like her leg would go out. She could sit for about half an hour, but then felt stiff and needed to move around (R. 419). She could lift two to three pounds comfortably.

Plaintiff also reported her activities of daily living. She woke around 8 am because she had a hard time sleeping. She also had difficulty with grooming and usually did not comb her

3

hair.  She tried to do some housework every day.  It took her three days to do laundry.  She was not able to take laundry out of the washer and place it in the dryer, so her son did it for her.  She did some exercises involving stretching with elastic bands, but she became exhausted and fatigued and had to lie down for about an hour (R. 420).  She did some cooking, but was limited to "things that you can just throw into a pot . . . crock-pot-type meals."  She was not able to clean up and cook in the same day.  She could not go grocery shopping because she cannot lift items off the shelves.  She went to bed around 7 or 8 pm and watched television.  Her son lived with her and did the yard and housework (R. 421).  She had three cats she fed and brushed.  She did not change the litter.  She was able to do a little dusting.

2. *Medical Evidence*

Plaintiff sought treatment for her hands in 1996 and 1997 (R. 132,148-50).  Plaintiff also had a history of neck and arm pain (R. 190).

On March 12, 1997, Plaintiff saw a psychiatrist (R. 151-53).  She felt depressed and had nightmares after she had burn marks following a surgery for which no one could offer an explanation.  She was diagnosed with post traumatic stress disorder.  Axis IV was rated moderate to severe and her GAF was 40 to 45 (R. 153).

On April 20, 2001, Plaintiff underwent an electromyogram (EMG) of her upper extremities, which was normal and showed no signs of cervical radiculopathy (R. 236, 263).  On June 16, 2001, magnetic resonance imaging (MRI) scans showed paracentral disc herniation of Plaintiff's cervical spine (R. 262).  There was also some narrowing of disc space and some degeneration.

4

On August 17, 2001, Plaintiff saw neurologist Ramesh Gopalaswamy and complained of neck and shoulder pain. Her reflexes were symmetrical, though somewhat hypoactive in the upper and lower extremities bilaterally (R. 189). She showed diminished sensation in the distribution of the C5-C7 dermatome in the left arm. There was no evidence of significant myelopathy though Plaintiff had intractable pain and paresthesias in her arms, left greater than right. She was asked to continue with physical therapy as a form of conservative treatment until she underwent a neurological examination. She was asked not to lift heavy objects or participate in activities that would aggravate her intermittent neck pain.

On September 12, 2001, Plaintiff saw Dr. Banwari Ladha, M.D., regarding neck and shoulder pain. Plaintiff reported that she usually was in good state of health (R. 190). Neck flexion was normal, but extension and lateral bending were very limited (R. 191). The Spurling on the left was strongly positive with painful extension of the upper left extremity. Dr. Ladha opined that physical therapy should be avoided, and that Plaintiff should try a cervical epidural steroid injection (R. 192). She was given the injection on October 29, 2001 (R. 340).

Plaintiff's complaints continued in late 2001 (R. 326-27). Physical therapist Ashok Bhandari completed a cervical follow-up report for Dynamic Rehabilitation Centers on December 31, 2004. Plaintiff's subjective neck and upper extremity pain was increasing (R. 198). Her pain remained at a 8-10 level on a 10-point scale. Her left arm was weak and numb. Plaintiff showed limited range of motion, yet she improved from prior examinations (R. 200). She was progressing slowly and had not reached maximum medical improvement.

Plaintiff sought frequent medical care in January, 2002, related to her neck and arm pain (R. 193, 194, 325). By January 17, 2002, Plaintiff's complaints had lessened and her pain level

was reduced to a 6 (R. 196). On January 18, 2002, Plaintiff saw Dr. Jeffrey Kimpson, M.D., who noted that cervical epidural steroid injections were not providing relief (R. 284). Trigger points were present in the left suboccipital, cervical paravertebral and bilateral trapezius. His impression was cervical radiculopathy, headache and myofascial pain. He recommended left occipital nerve block and trigger point injections. Dr. Kimpson indicated that he would make a referral for surgical evaluation.

Plaintiff continued complaining of pain in March, 2002 (R. 322). Neurosurgeon Teck Mun Soo, M.D. saw Plaintiff on March 7, 2002 (R. 237-38). Plaintiff rated her neck and arm pain as 10/10. She could perform all activities of daily living. Her movement was limited by the pain (R. 238). Dr. Soo evaluated Plaintiff's MRI, which showed severe degenerative arthropathy at 3-4, 4-5, 5-6 and 6-7. There was no neural compression, but possibly mild spinal stenosis at C5-C6. Surgery would likely resolve most of her pain, but it would be an involved procedure. Dr. Soo noted that Plaintiff had attempted every way to seek conservative treatment, but that she had run out of options, and he thought the pain would "drive her to surgery" (R. 239). In the meantime, he suggested traction. She would require future surgeries if she sought surgical resolution. In March 13, 2002, trigger points were present bilaterally in the cervical paravertebral area (R. 283). Dr. Kipsom's impression was cervical radiculopathy. He recommended reevaluation for continued physical therapy.

On April 11, 2002, Bala S. Prasad, M.D., examined Plaintiff at the request of the Detroit Public Schools (R. 240-47). The benefits from her physical therapy stopped as soon as the therapy session ended (R. 242). Plaintiff reported that Dr. Soo told her that surgery was not indicated in her case. X-rays were taken, which showed extensive degenerative changes of the

cervical spine from C3 through C7 (R. 245). Dr. Prasad noted that Plaintiff's condition will likely become worse with time. Plaintiff might be better suited for a job which avoids overhead activities, repetitive rotational movements of the cervical spine, and lifting more than 10 to 15 pounds (R. 247).

On May 23, 2002, L. Patel, M.D., examined Plaintiff on behalf of Michigan Disability Determination Services (R. 248-50). She exhibited mild neurological deficits of her left upper extremity (R. 249), mild tenderness of her left cervical paraspinal area, no cervical spine muscle spasms, good functional range of motion in her upper extremities, and decreased grip strength (R. 250). Plaintiff's lumbar spine evaluation was normal, and she had normal deep tendon reflexes in her arms and legs (R. 249). She had good dexterity, showing abilities to button, pick up coins and write (R. 250). She was unable to lift more than a couple pounds with her left arm, and was unable push or pull any object. She was able to walk without assistance, sit, stand, and get on and off the examination table without difficulty.

Plaintiff complained of neck pain and stiffness on June 6, 2002 (R. 319). Plaintiff underwent another examination on behalf of Disability Determination Services on June 13, 2002 (R. 251-55). Plaintiff cried during the interview and was very depressed because of her loss of livelihood (R. 251). She was proud of teaching and wanted to work. B. Shaw, M.D., found that Plaintiff had decreased ranges of neck and shoulder motion, but had full ranges of motion in her hips, knees and ankles (R. 252). She had normal (5/5) strength in her arms and legs and normal reflexes. She had a steady gait. Her left forearm, wrist and fingers were hypersensitive to pin prick. Dr. Shaw's impressions were cervical radiculopathy, chronic diminished range of motion of the left shoulder requiring further evaluation, migraine headaches, and depression, for which

7

psychiatric evaluation was necessary.  X-rays showed a narrowing of the C3-4 and C6-7 disc space with spurring and sclerosis of the adjacent articular surfaces, revealing degenerative disc disease (R. 255).

On June 14, Plaintiff returned to Dr. Kipson for reevaluation (R. 281).  She reported about thirty percent improvement with her last cervical epidural steroid injection.  The pain resolved with less activity.

Plaintiff saw Dr. Kipson again on July 22, 2002 (R. 280).  Her pain level was 5-6/10.  Her injection was helpful for about five weeks.  Plaintiff reported that physical therapy helped.  She was using a TENS unit, which was somewhat helpful.  There were painful palpable trigger points in the bilateral trapezius and rhomboids.  His impression was cervical radiculopathy and myofascial pain.  He planned to continue conservative treatment.

Plaintiff complained of neck stiffness, numbness of hands radiating to right shoulder, and difficulty swallowing on August 1, 2002 (R. 315).  On August 18, she added complaints of blurred vision and left facial spasm that radiated to the neck (R. 313).

On September 9, 2002, Donald C. Austin, M.D., examined Plaintiff and evaluated her neurological condition (R. 273-77).  Plaintiff reported that neurosurgeon Dr. Soo "wouldn't touch [her] with a ten foot pole" (R. 273).  She reported that as a teacher, she would correct or grade some seven to ten thousand papers per week (R. 274).  She previously injured her hand when stapling five thousand pieces of paper.  She sat normally during her interview and assumed no abnormal bodily posturing.  Plaintiff had no difficulty getting on and off the examination table, and she had a normal gait.  During ordinary conversation, she moved her head and neck in a normal fashion, but during examination, she restricted full flexion to 25 degrees and

hyperextension to 20 degrees and left head and neck rotation 80 degrees.  When asked to grip as hard as she could, she made no effort, and she had no muscle atrophy in any extremities.  She had normal strength in the muscles of her right upper extremity but on the left side she tended to release and give-way complaining of pain, especially in the deltoid region.  Dr. Austin noted that is spite of a MRI scan showing multiple disc herniations, they were predominantly on the left side and yet an EMG study was normal and she had bilateral symptomatology (R. 276).  There were no objective findings to correspond with the MRI abnormalities on physical examination and there were inconsistencies and exaggerations on Plaintiff's part.  Dr. Austin concluded that Plaintiff needed restrictions against lifting and overhead work (R. 277).

On October 4, 2002, Dr. Kipson reevaluated Plaintiff (R. 278).  She continued to have severe neck pain.  She had left leg pain.  Her TENS unit was minimally helpful.  The plan was cervical epidural steroid injection with the Image Intensifier.  Plaintiff's symptoms were worsening (R. 279).  On October 7, Plaintiff continued her complaints of severe neck pain (R. 309).  She was noted to be depressed.

On October 9, 2002, Dwight E. Smith, M.D., Plaintiff's treating physician, wrote a letter to the "Officer of the Court" in which he summarized Plaintiff's medical condition and reported that Plaintiff's severe, debilitating pain and inability to rotate her neck or move her upper body without pain effectively impaired her ability to pursue gainful employment (R. 304).  She appeared deeply depressed and emotionally dysfunctional.  Dr. Smith opined that Plaintiff would never again be qualified to work effectively.  There was no question that Plaintiff has been permanently disabled by most criteria and is unable even to manage her daily routine activities without severe restrictions and she required assistance in many regards.

9

Plaintiff complained of numbness and difficulty getting dressed on November 4, 2002 (R. 307). She had headaches and was depressed. On November 18, Plaintiff complained of pain radiating to the base of her skull, and depression (R. 306).

On March 3, 2003, Dennis S. Giannini, M.D., evaluated Plaintiff's complaints of pain in her head, neck and lower back (R. 370-73). He recommended that Plaintiff begin a walking program, and that her primary care provider lower her amount of medications (R. 370). He would consider an organized physical therapy program once Plaintiff built up an adequate cardiovascular reserve. He advised that Plaintiff abstain from repetitive or prolonged over chest level work or cervical spine extension, no repetitive or forceful pushing or pulling, and no lifting greater than fifteen pounds.

On April 2, 2003, Dr. Giannini reported that Plaintiff showed some increased range of neck motion (R. 368). She continued complaining of significant neck pain radiating to the left, and received a left suprascapular nerve block. She was instructed not to limit the time or distance in the walking program based on how she felt and maintain a regular and progressive amount of exercise daily. Plaintiff reported less pain after following the plan.

On April 22, Plaintiff reported that the injection provided good pain relief for about one week (R. 367). She was walking eleven minutes daily. She had improved cervical range of motion

On May 20, 2003, Plaintiff complained to Dr. Giannini of a headache with a 6/10 pain level (R. 366). The headache was intermittent and generally she was doing well. She was having increased difficulty lifting her left arm and reaching behind her back. She was up to sixteen minutes daily on the treadmill. She was progressing slowly as he had suggested. She

10

2:04-cv-72170-JCO-SDP   Doc # 13   Filed 04/29/05   Pg 11 of 22   Pg ID 513

looked forward to neck and back exercises as they provided some temporary relief. She received bilateral suprascapular nerve blocks (R. 365). On May 24, 2003, an MRI scan showed left shoulder tendinosis, without tear of the rotator cuff (R. 381). An electromyogram (EMG) and nerve conduction studies were consistent with left C5-6 radiculitis (R. 382-83).

On June 27, 2003, Dr. Giannini reported some improvement (R. 362). He ordered a comprehensive exercise based physical therapy program (R. 361). She received bilateral suprascapular nerve blocks. She received additional nerve blocks on July 30, 2003, when she reported that her pain was not as severe (R. 359-60). On August 27, Plaintiff reported slow but steady progress, yet complained of considerable neck, shoulder, back, and low back pain (R. 357-58). Dr. Giannini extended her physical therapy program for an additional four weeks. He gave her literature about fibromyalgia.

On September 25, 2003, a Doppler study showed mild right thoracic outlet syndrome (R. 378). On September 26, Plaintiff returned to Dr. Giannini and reported that she had a significant flare-up of pain associated with the weather change (R. 356). Her primary care doctor prescribed Neurontin, but this caused significant sleepiness and weight gain, and did not significantly improve her pain. Plaintiff had completed the physical therapy program and continued with an independent rehabilitation program on a daily basis.

On October 2, 2003, Plaintiff sought psychiatric treatment from Dr. Fran Klein-Parker, PhD. Plaintiff had been depressed since she was unable to work (R. 400). She missed her job. Dr. Klein-Parker noted that Plaintiff was very intelligent and had intact thought processes (R. 401). Her affect was sad and tearful. Plaintiff was scared and insecure about her future, felt a

11

loss of identity without a job, and felt worthless (R. 402).  Axis IV noted moderate to severe stressors (R. 403).

On October 24, 2003, Plaintiff returned to Dr. Klein-Parker (R. 399).  Plaintiff was subdued.  They discussed medications and side effects, stress, blood pressure, appetite, ups and downs of life, and time management.

On October 29, 2003, Dr. Giannini completed a questionnaire, on which he indicated that Plaintiff's impairment involved her cervical, thoracic, and lumbar spine (R. 345).  He indicated that Plaintiff had muscle spasm, limitation of spine motion, muscle weakness, and sensory loss (R. 345).  Plaintiff was able to walk on her heels and toes, and had equal reflexes (R. 346).  Her gait was slow.  She had no muscle atrophy (R. 347).  He summarized EMG, MRI, and X-ray findings.  She treated her symptoms with physical therapy and non-steroidal anti-inflammatory medication (R. 348).  Dr. Giannini indicated that Plaintiff's symptoms would interfere with her ability to maintain reliable attendance in a work setting, and that her symptoms were consistent with the medical findings.  Dr. Giannini also evaluated Plaintiff on that date.  She continued to complain of radiating neck and low back pain, as well as shoulder pain, headaches, numbness, tingling and muscle spasms (R. 353-54).  On November 18, 2003, Dr. Giannini gave Plaintiff another nerve block (R. 351-52).  He reinforced the importance of regular stretching and moderate cardiovascular and strengthening exercises.  He also outlined a plan to discontinue Vicodin.

On November 6, 2003, Plaintiff saw Dr. Klein-Parker and was tearful and depressed (R. 398).  Her home was close to foreclosure.  She did not leave her home unless she had an appointment.  Dr. Klein-Parker encouraged her to be more hopeful about the future.  Plaintiff

was diagnosed Plaintiff with dysthymia and major depression (R. 395-97).  Plaintiff had

"marked" restrictions of activities of daily living, difficulties in maintaining social functioning,

and difficulties in maintaining concentration, persistence or pace (R. 396).  Plaintiff's symptoms

would interfere with the ability to maintain reliable attendance in a work setting (R. 397).

Plaintiff was under a lot a stress due to of lack of finance because she can not work.  She hated

her life and felt useless.  She had constant fear and anxiety over security, and had no support

system.

On December 10, 2003, Plaintiff reported about two weeks of relief after the injection

she received on her last visit (R. 350). She had been reducing the Vicodin.  Dr. Giannini reported

that Plaintiff was walking 45 minutes each day, and was performing exercises for her neck and

lower back.  Plaintiff was beginning to see some improvement.  She reported continuing

problems sleeping, but noted improved sleep when she exercised later in the day.  Plaintiff

received another nerve block (R. 349).  He outlined slowly increasing her walking speed.

### 4.   *ALJ Findings and Decision*

ALJ Varga found that Plaintiff had the "severe" impairments of multiple herniated discs

of the cervical spine, cervical radiculopathy, and an affective disorder, but that she did not have

an impairment or combination of impairments which met or equaled in severity the criteria of an

impairment found in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1 (R. 20).  The

ALJ found that Plaintiff retains the residual functional capacity ("RFC") to perform a range of

light work with limitations of a sit/stand option, limited reaching over the chest or shoulder level,

no lifting over 15 pounds, no work around unprotected heights, no driving, no climbing, no work

around hazardous machinery, only simple and routine tasks, a low stress work environment, and limited contact with the public, co-workers and supervisors (R. 21).

II.     ANALYSIS

      A.     Standard of Review

      In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Secretary of HHS*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

      If the Commissioner seeks to rely on VE testimony to carry his burden of proving the existence of a substantial number of jobs that plaintiff can perform, other than his past work, the testimony must be given in response to a hypothetical question that accurately describes plaintiff in all significant, relevant respects. A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the plaintiff can perform.

      If the Commissioner seeks to rely on VE testimony to carry his burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than his past work, the

testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[1]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

Also, an ALJ must give specific reasons when finding a Plaintiff's testimony not credible.  SSR 96-7p.

B.    Factual Analysis

Plaintiff argues (1) that the ALJ did not give proper weight to the opinions of Drs. Smith, Giannini, and Klein-Parker, (2) the hypothetical question was defective, and (3) the ALJ did not properly consider the side effects of her medication.  Because Plaintiff's claim regarding the inaccurate hypothetical question warrants a reversal of the current decision and a remand, the other asserted errors which also relate solely to this decision need not be addressed.  If the surrogate decision again denies benefits, and if Plaintiff's counsel asserts that it does not comply with either the treating source regulations or give adequate consideration to the side effects of Plaintiff's medications, this Court can then address those issues in the context of that administrative decision.

―――――――――――――

[1] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

15

ALJ Varga  credited Plaintiff enough to find a moderate concentration impairment, but then did not ask a proper hypothetical question regarding this determination.  Although there may not be incontrovertible evidence of Plaintiff's concentration deficiencies (see, e.g. R. 108), the ALJ classified her impairment as moderate (R.  19).

While a "moderate" level of concentration problems – as opposed to "marked" or "extreme" levels – is not sufficient to qualify for a finding of disability under the Commissioner's listing of impairments at Step 3 of the Commissioner's sequential evaluation it is nonetheless a relevant non-exertional limitation that must be taken into account in a hypothetical question at Step 5 of the Commissioner's sequential evaluation because it is a vocationally relevant factor.

The issue is whether ALJ Varga's hypothetical question is sufficient to accommodate Plaintiff's problems respecting concentration, persistence and pace.  ALJ Varga noted that Plaintiff did not exhibit significant limitations regarding concentration, persistence or pace (R. 19).  He cited some medical reports, finally stating, "Nonetheless, giving the benefit of the doubt to the claimant, this degree of limitation is rated "moderate."  The prior discussion of medical records lists other findings of Plaintiff's impaired ability to concentrate.  Yet, having found moderate limitations in concentration, persistence and pace, ALJ Varga in his hypothetical question  limited the claimant to low stress, relatively simple and routine work which did not require more than a few steps and that required only limited contact with others (R. 425).  Obviously, simple jobs, with low stress and little contact with others does address in part impairments involving concentration limitations.  Yet, based on the case law, it falls short of adequately accommodating such concentration limitations.

16

Under earlier regulations on mental impairments, *Bankson v. Commissioner*, 127 F. Supp. 2d 820 (E.D. Mich. 2000), noted that it was reasonable to conclude "that a mental deficiency occurring 'often' may not be consistent with substantial gainful employment." *Id*. at 826. The Court then determined that under the relevant portion of the PRTF, "often" should logically be defined as fifty percent of the time. *Id*. at 827. In *Bankston*, the finding that the claimant often had deficiencies of concentration, paired with the uncontested findings of the treating physician that he was disabled, resulted in a finding of disability and a remand for award of benefits. While the *Bankston* holding that "often" meaning fifty percent of the time has been questioned as contrary to the Commissioner's Psychiatric Review Technique form instructions, and to the principle of deference to an administrative agency's construction of its own regulations, [2] and *Bankston* has not commanded much allegiance on this issue, it and other cases do seem to note correctly that a proper hypothetical question must consider the severity of a claimant's concentration problems once there has been an ALJ finding of such a limitation. The Commissioner – possibly in light of *Bankston* – has modified this psychiatric review regulation and the corresponding psychiatric review technique form (PRTF) so that limitations in concentration are no longer measured in terms of frequency, but rather on a five-point scale: none, mild, moderate, marked, and extreme. *See* 20 C.F.R. § 404.1520a(c)(4) (Sept. 20, 2000); Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury; Final

---

[2] *See* Report and Recommendation accepted by Chief Judge Rice in *Ogden v. Apfel,* Case No. c-3-00448 (S.D. Ohio June 11, 2001) (suggesting that *Bankston* is simply wrong because it ignores the Commissioner's interpretation of "often" in the regulations to which judicial deference is owned under the expansive case law that elaborates *Udall v. Tallman,* 380 U.S. 1, 16-17 (1965).

Rules, 65 Fed. Reg. 50,745, 50, 775 (Aug. 21, 2000); Revised Medical Criteria for Evaluating

Mental Disorders and Traumatic Brain Injury; Correction, 65 Fed. Reg. 60584 (Oct. 12, 2000).

Under the former regulations,  the Sixth Circuit had held that an ALJ's failure to include

in a hypothetical question a  PRTF finding that a claimant "often" has difficulty concentrating is

not necessarily a basis for reversal and a remand when the hypothetical question adequately

describes that claimant's limitations arising from a mental impairment in some other way.  *Smith*

*v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).   In *Smith*, the Sixth Circuit noted that

> the ALJ went beyond this simple frequency assessment to develop a
> complete and accurate assessment of Smith's mental impairment, as
> *Varley* requires.  In particular, the ALJ relied on the testimony of four
> physicians who characterized Smith's concentration problems as minimal
> or negligible.  The ALJ then translated Smith's condition into the only
> concrete restrictions available to him–examining psychiatrist Schweid's
> recommended *restrictions against quotas, complexity, stress,* etc.–and
> duly incorporated them into his hypothetical to the vocational expert.

 *Id.* at 379 (emphasis supplied).

Thus, after *Smith,* when an ALJ makes a PRTF finding that the claimant "often" has

problems with concentration, but does not specifically include that specific limitation in the

hypothetical question, the question is whether the ALJ used adequate alternate concrete job

restrictions in the hypothetical question that suitably accommodated the worker's concentration

limitations.   Similar considerations are appropriate today under the modified regulation

notwithstanding the Commissioner's change of classification terms from "often" to  "moderate."

Thus, where there is a finding by the ALJ of moderate concentration problems of the claimant,

these must be suitably accommodated in the hypothetical question in some fashion.

A hypothetical question posed to the VE should include specific job-related restrictions,

rather than broad limitations or categorical terms.  While the ALJ is not required provide a

verbatim recitation of the medical findings, and thus as in *Smith* need not expressly use the exact terms "often" or "moderate," the hypothetical question must adequately reflect those limitations. One court has held that a reference merely to "unskilled sedentary work" in a hypothetical question is insufficient to describe and accommodate concentration deficiencies. *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996); *McGuire v. Apfel*, 1999 WL 426035, at *15 (D. Ore. 1999). This Court in *Bielat v. Comm'r of Soc. Sec.*, No. 02-70791 (E.D. Mich. Apr. 4, 2003) (quoting *Andrews v. Comm'r of Soc. Sec.*, No. 00-75522 (E.D. Mich. Dec. 18, 2001) and citing *Thomczek v. Chater*, 1996 WL 426247 (E.D. Mich. 1996), has held that a hypothetical question including "unskilled sedentary work" plus the limitation of "jobs low at the emotional stress level" is not sufficient to accommodate a finding of a "marked" limitation in ability to concentrate or persist at tasks. *Andrews v. Comm'r of Soc. Sec'y,* No 00-75552 (E.D. Mich, Dec. 18, 2001), found that "difficulties in concentration" in a hypothetical question was insufficient to describe someone who has "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner . . .often." This Court in *Keyser v. Barnhart,* No. 03-60078 (E.D. Mich Sept. 2, 2004) (unpublished), held that a hypothetical question of "unskilled jobs with a low stress level alone" is not sufficient to accommodate a claimant who, under the Commissioner's new regulations, has "moderate limitations with respect to concentration, persistence or pace."

*Smith* found that a hypothetical question that took into consideration "quotas, complexity, stress" was adequate in a case where the record also contained four physicians who characterized Smith's concentration problems as minimal or negligible. Here the hypothetical

19

question limited the worker to relatively simple and routine low stress work, not requiring more than a few steps, and requiring only limited contact with others (R. 425).

There seem to be two components to having problems in concentration - whether characterized as being "often" or "moderate." One deals with the frequency of how often one cannot concentrate. The other deals with the level of sophistication or intensity of the work that can be done with the concentration limitation. The hypothetical question asked by the ALJ encompasses to some extent the later effects of concentration problems by limiting the hypothetical worker to simple work with limited stress and contact with others. But it does not seem to specifically address the frequency of how often that worker would be unable to concentrate. *Smith* appears to have dealt with the frequency problem by excluding jobs with quotas that require certain expected outcome in set time periods and would be difficult to meet with frequent problems with concentration. Judge Varga did not exclude jobs with quotas. Nor can it be said that "low stress" jobs necessarily precludes jobs with quotas or other production deadlines. Here, the 6,100 jobs identified by the vocational expert and relied on by Judge Varga were light exertional packer, sorter and assembler. While the VE did not discuss quotas or production line aspects related to any or a significant number of these jobs, they do not seem to be jobs that would be regularly handled in a competent manner by a worker with moderate concentration problems. Thus, unlike *Smith,* the current hypothetical question is not adequate on the issue of moderate limitations of concentration, persistence and pace for this Court to have any idea as to the number of the packer, sorter and assembler jobs identified by the VE that would be excluded if quotas or other aspects related to moderate concentration limitations were added to the hypothetical question.

20

*Faucher v. Sec'y of HHS*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that after finding reversible error it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher* citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

In this case "all essential factual issues" have been *not* been resolved with regard to impact of Plaintiff's concentration limitations on her vocational capacity. In *Bielat*, this Court remanded for an award of benefits, but in that case, the ALJ had found the Bielat had "marked" limitations in concentration – more severe than "moderate" on the Commissioner's scale which is involved here – and also on cross examination the VE to admitted that all jobs would be eliminated if frequent deficiencies of concentration, persistence or pace were found. Thus, that is a far stronger case for a remand for benefits.

Nor is the current case one where "proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." Accordingly, a remand for further administrative proceedings consistent with this Report and Recommendation is necessary. The other issues raised by Plaintiff's counsel also can be dealt with on remand.

III.   RECOMMENDATION

For the above stated reasons IT IS RECOMMENDED that Defendant's motion be DENIED and Plaintiff's motion be GRANTED IN PART and this case remanded for further proceedings consistent with this Report and Recommendation.

21

The parties to this action may object to and seek review of this report and recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C.. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Steven D. Pepe
UNITED STATES MAGISTRATE JUDGE

Dated: April 29 , 2005
Ann Arbor, Michigan

Certificate of Service

I hereby certify that on April 29, 2005, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Kenneth Laritz and Geneva Halliday.

s/William J. Barkholz
Courtroom Deputy Clerk

22